Bellacosa, J.
(dissenting). The United States Supreme Court has ruled that the New York State Court of Appeals erred in reversing the murder conviction of defendant-appellant Harris (New York v Harris, 495 US —, 110 S Ct 1640, revg 72 NY2d 614 [Wachtler, Ch. J., and Bellacosa, J., dissenting]). Undeterred, the same majority of this Court creates a new theory upon which to again reverse and suppress a station house confession, deciding that it is mandated by State constitutional considerations. We strongly disagree and would affirm the conviction.
The majority’s dogged choice in this case is not compelled or supported by existing Federal or State precedents or principles. Rather, to accomplish its result, the majority:
(1) rejects the analysis, wisdom and experience of the United States Supreme Court with respect to its Payton (Payton v New York, 445 US 573) rule;
(2) rejects the undisturbed attenuation fact findings of both of our own lower courts in violation of our own State constitutional review limitations;
(3) rests its result on a significantly expanded State right to counsel concept, injected into this case for the first time after all appeals have been exhausted, including to the United States Supreme Court;
(4) converts a pure Fourth Amendment search and seizure dwelling protection case into a theoretical right to counsel construct;
(5) justifies its yonder reach as necessitated by a perceived enhancement of deterrence policy;
(6) bypasses this Court’s long-standing "issue preservation” principles; and
(7) unsettles law principles in all of the above areas and, most disconcertingly, adds the implication that the police are legally and constitutionally *443 required to commence a criminal proceeding as soon as they believe they have probable cause.
The choice to discount and disregard all these jurisprudential policies and principles in this unworthy case is astonishing and is effected against a most unusual evidentiary and procedural backdrop.
This case is not about the police invading the defendant’s dwelling. They had legal and constitutional probable cause to believe that defendant had committed a heinous murder and they did what society expects its law enforcement officials to do: they set out to locate and apprehend the suspected murderer. They knocked on his apartment door, they identified themselves, they asked to be let in, defendant let them in, sipped wine and engaged them in conversation after being given warnings on his rights. He even told them how glad he was that they came for him. He then confessed to slitting his girlfriend’s throat, nearly decapitating her, because he thought she was a bad mother. That confession, made in his apartment, was suppressed, was not used in his trial, and is not at issue here. An hour later at the precinct and after further warnings, advisements and personal waiver of rights, defendant again voluntarily confessed.
The legality of the second confession, used in evidence at his trial (nonjury and without defense counsel, at defendant’s express request), is the only question again before this Court under the standard mandate from the United States Supreme Court for "proceedings * * * in conformity with the judgment of this [United States Supreme] Court above stated, as accord with right and justice, and the Constitution and Laws of the United States.” The Supreme Court mandate directs this Court of Appeals to proceed "not inconsistently] with the opinion of this [United States Supreme] Court.” We believe the majority today proceeds "inconsistently” and not "in conformity” with that part of the United States Supreme Court’s opinion declaring the law of the land on its Payton principle and on the sweep of the deterrent aspect of the exclusionary rule flowing from that principle. No properly or timely presented or relevant "local” or "parochial” interest of New York justifies that affront.
There can be little dispute that the Fourth Amendment of the Federal Constitution and article I, § 12 of the New York • State Constitution "contain similar language [and] share a common history” (majority opn, at 438). Inasmuch as the major *444 ity suggests that they appear to confer similar protections, we believe they should be consistently construed in this case. Nevertheless, the majority declares its deviation from the United States Supreme Court decision, and clings to its rejected prior result, by resorting to a deus ex machina — a newly fashioned Payton/Samuels right to counsel (see, Payton v New York, 445 US 573, supra; People v Samuels, 49 NY2d 218). Most assuredly, that is a novel and significantly expanded State constitutional hybrid.
A fundamental flaw in the majority’s approach is that this case has not been in its six-year history — up to today — about any kind of right to counsel. All the courts so far have struggled with a pure Fourth Amendment Payton right: protection against warrantless arrests in a dwelling. Indeed, the Court’s prior majority opinion (People v Harris, 72 NY2d 614, 620, supra) acknowledged that the precise constitutional infraction was a Payton violation, not the infringement of some artificially triggered right to counsel.
The precise holding of People v Samuels (49 NY2d 218, supra) is that a defendant’s right to counsel attaches when a felony complaint is filed and an arrest warrant issues, and that the right cannot thereafter be waived in the absence of counsel. Defendant Harris was arrested without a warrant and with no felony complaint filed and with no criminal proceeding having been begun. The Samuels counsel rule is therefore on its face not applicable. Yet the majority "deems” the warrant prerequisite to have been met, activating the right to counsel — a clear fictional extension of the rule itself. The precise Samuels holding has never been so extended even in a true right to counsel case. Moreover, the majority makes this policy expansion in the immediate wake of this Court’s recent contraction of the right to counsel protection propounded in a true right to counsel case (People v Bing, 76 NY2d 331). Then, Bing is incongruously cited in support of New York’s "peculiar” (majority opn, at 439) right to counsel tradition. As dissenters here, we remain equal, true, steadfast and proud participants in the appropriate New York right to counsel tradition, but we are completely baffled by the majority’s peculiar importation of that tradition into this Payton case.
The particular New York right to counsel angle is claimed to be needed to serve some newly perceived special deterrent objective, directed against the police. Keeping in mind, how *445 ever, that the conduct to be deterred is that which violates Payton’s dwelling sanctuary protection, we fail to see how that objective is served by suppressing the subsequent precinct confession. It is speculative that the police intended to violate defendant’s Payton right and even more speculative that they intended to evade any of his New York counsel rights. Nor is there any evidence that they "exploited”, in the legal or actual sense of that word, the Payton dwelling infraction in the subsequent precinct interrogation. The police were under no constitutional or legal obligation to obtain a warrant and thus commence the criminal proceeding at a particular time which some court might thereafter determine to be the precise moment of truth. Many entirely legal and potentially unfolding courses of action were still open to the police to properly continue their investigation and acquisition of admissible evidence (e.g., spontaneous, consensual, nonprotected, attenuated or even "lucky” encounters and acquisitions — fact matters only definitively resolved months and years later by reflective judicial adjudication) (compare, People v Davis, 75 NY2d 517). The record shows that the police intended to locate the defendant and does not show that they intended to arrest him illegally. Indeed, there is evidence and proper inference that they intended to arrest him only after detérmining his location and then getting a warrant, if other legal means did not present themselves.
We therefore see no reason to stretch precedent and twist logic in order to rescue this defendant from a United States Supreme Court decision against him. As the United States Supreme Court itself explained in rejecting an argument that suppression here would deter Payton violations:
"[T]he principal incentive to obey Payton still obtains: the police know that a warrantless entry will lead to the suppression of any evidence found or statements taken inside the home. If we did suppress statements like Harris’, moreover, the incremental deterrent value would be minimal. Given that the police have probable cause to arrest a suspect in Harris’ position, they need not violate Payton in order to interrogate the suspect. It is doubtful therefore that the desire to secure a statement from a criminal suspect would motivate the police to violate Payton. As a result, suppressing a station-house statement obtained after a Payton violation will have little effect on the offi *446 cers’ actions, one way or another.” (New York v Harris, 495 US, at —, 110 S Ct, supra, at 1644.)
This analysis makes common sense and reflects a realistic judicial understanding of the dynamic acted out on the hard streets by the participants in such matters, without sacrificing any constitutional values, including our own State’s.
The majority rejects that superior perspective and then adds insult to the injury by conclusorily relieving the Court of Appeals of its long-standing obligation to respect and abide by our own lower court undisturbed factual findings. The suppression Justice who heard the police witnesses determined that there was "a sufficient attenuation; the [r]ights were given again” and that the statement in the station house "was independently given by [defendant] voluntarily”. Four Justices constituting the majority at the Appellate Division voted to affirm defendant’s conviction and expressly agreed with the Trial Justice that there was attenuation, concluding that "the police station statement was 'sufficiently an act of free will to purge the primary taint of the unlawful invasion’ ” (124 AD2d 472 [cite omitted]) and that "any 'taint’ resulting from an illegal arrest was removed by the lapse of time between the statements and the rereading of the Miranda warnings” (124 AD2d, supra, at 475). The record evidence supports and confirms this key chain of attenuating events: the change of scene from a "protected” dwelling to an "unprotected” precinct; intervening passage of about one hour’s time; and renewed warnings by the police authorities and new waivers by defendant.
There is no justification for conclusorily sweeping aside these facts and rulings as legally insignificant. Nor should consideration of the full evidentiary picture of this case be foreclosed in this unusual remand/reargument procedural posture. All the evidence must be freshly relevant and independently pertinent to the issues as the majority has now cast them because they concededly turn anew on "a judicial perception of sound policy, justice and fundamental fairness” (People v P. J. Video, 68 NY2d 296, 303, cert denied 479 US 1091). Thus, we cannot comprehend the majority’s determination, apparently made as a matter of law and of "sound policy, justice and fundamental fairness”, to suppress a precinct confession that all the lower State courts have found to be attenuated from the Payton violation and that the United States Supreme Court has determined to be admissible because attenuation is irrelevant.
*447 The majority’s rejection of the undisturbed attenuation findings is strikingly inconsistent with their insistence that the Court is bound by a very shaky determination that the defendant had not consented to the police entry into his apartment (as the police then believed, as two fact-reviewing Appellate Justices found, and as two other fact-reviewing Justices found too close to call). The majority cannot have it both ways. Intellectual and analytical discipline demand some consistency at least in this respect to avoid breeding disrespect for the decision-making process. Why should law enforcement officials be "deterred” by a court ruling that unfairly brands them in belated hindsight as flagrant wrongdoers and circumventers of the law, and why should they respect its edict which simultaneously rejects the adjudicative work of all the other courts in this very case in these circumstances? It is the epitome of institutional egocentricity, a kind of Copernican view of the judicial universe, to reject (1) the United States Supreme Court analysis on a rule it first established (Payton v New York, 445 US 573, supra); (2) the Supreme Court’s latest interpretation of the deterrence and application breadth of that rule (New York v Harris, 495 US —, 110 S Ct 1640, supra); and (3) the undisturbed factual findings of both our own lower courts (five Justices in all) on the dispositive attenuation factual issue.
Legally and literally, today’s holding metamorphosizes the Payton private dwelling sanctuary into the public precinct house, and then further transforms the jurisprudence by converting Payton’s Fourth Amendment dwelling right into a fused Fifth and Sixth Amendments personal right to counsel —State version. The history of NY Constitution, article I, § 12 and its proud right to counsel tradition, as applied in a Payton context, do not support leapfrogging beyond the United States Supreme Court’s decision in this procedurally convoluted case. The majority effectively relegates that Supreme Court’s work to an academic judicial exercise with no consequence for the real outcome of this case. One has to believe that the United States Supreme Court has a continuing interest in the sweep and application of its nationally propounded Payton rule and interpretation, for why else would it have granted certiorari, heard argument, reversed the case on the merits, issued its definitive opinion of the Court, and remanded to this Court for proceedings "not inconsistent with [its] opinion”?
Inasmuch as we cannot concur in the majority’s bold latest *448 chapter to this case, we vote to affirm the order of the Appellate Division affirming the judgment of conviction for murder, as reinstated by the United States Supreme Court.
Judges Kaye, Alexander, Titone and Hancock, Jr., concur with Judge Simons; Judge Titone concurs in a separate opinion; Judge Bellacosa dissents and votes to affirm in another opinion in which Chief Judge Wachtler concurs.
Upon reargument, following remand by the Supreme Court of the United States, order reversed, etc.